Filed 3/4/13  In re A.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| In re A.S. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.S.,<br><br>    Defendant and Appellant. | E056761<br><br>(Super.Ct.No. RIJ1200355)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Matthew C. Perantoni, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Dismissed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, Anna M. Deckert, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

At a jurisdiction and disposition hearing, the juvenile court granted A.K. (Mother) reunification services for her dependent children, J.K. and A.S. J.S. (Father), the presumed father of J.K. and A.S., appeals the juvenile court's decision granting Mother reunification services. Father asserts the juvenile court erred because Mother was actively involved in causing J.K. to suffer severe physical harm. (Welf. & Inst. Code, § 361.5, subd. (b)(6).)[1] We dismiss the appeal.

## FACTUAL AND PROCEDURAL HISTORY

A.      BACKGROUND

Father is the presumed father of both children. J.K. is male and was born in 1998. A.S. is female and was born in 2004. In April 2012, Mother and Father were in the process of divorcing one another. Mother is a member of the Heart of Worship Church (the church). Mother credits the church with helping her escape Father's domestic violence. In 2009, the church helped Mother move from Upland to Corona. Mother resided in a homeless shelter for 21 months before moving into the church's "women's home," which is a house that has been converted into three separate units. Mother and the children resided in the women's home. Due to the domestic violence, in 2010, Mother obtained a permanent restraining order against Father, which expires in

---

[1] All subsequent statutory citations will be to the Welfare and Institutions Code unless otherwise indicated.

2

September 2013.[2]  Father did not have contact with the children for three years, though he states he paid child support during those years.

B.    DETENTION

In March 2012, A.S. was seven years old and J.K. was 13 years old.  At that time, A.S. told Mother J.K. had been engaging in sexual intercourse with A.S.  Mother asked the church pastor and male congregants to discipline J.K. for sexually abusing A.S.

One night, two male congregants woke J.K., took him to the desert near Barstow, gave him a shovel, and told him to dig a grave because they were going to kill him.  When J.K. wanted to stop digging, the men would strike him with a belt across his back and arms and threaten him.  J.K. suffered "cuts all over his back."  Once J.K. finished digging the hole, the men forced J.K. to lie down in it.  The men began covering J.K. with dirt, so that his whole body, including part of his face was covered with dirt.  J.K. cried and begged for his life.  J.K. told the men, "'I want my Jesus.'"  J.K. believed the men were going to kill him. Eventually the men allowed J.K. to leave the grave after "they thought he learned his lesson."

_____

[2]  There is some confusion in the record regarding the expiration date of the permanent restraining order.  The minute order from the trial on September 8, 2010 reflects:  "The court orders that the existing temporary restraining and stayaway orders are made permanent orders of the court and are to be in effect for 3 years from today's date.  [¶]  The order shall expire at midnight on 09/08/12."

3

At least one of the men recorded the incident on his cellular telephone. A church member confirmed that he required J.K. to dig a grave approximately two feet deep, and that he threw dirt on J.K. once J.K. was in the grave. The church member understood how J.K. could have believed he would be killed in the desert that night.

The following day, J.K. was bound to a chair with zip ties on his wrists and ankles and placed in a shower while naked. Two congregants sprayed mace on J.K.'s face. One of the men struck J.K.'s face with a telephone book. J.K. was left alone in the shower, with mace on his eyes and face for 30 to 45 minutes. J.K.'s nose bled. J.K. thrashed from side to side, splattering blood across the shower. When the men returned, they washed J.K.'s face. J.K.'s eyes were puffy for a "few days."

The next day, during an all male Bible study in the pastor's garage, the pastor asked J.K. to sit in the middle of a group of approximately 12 men. J.K. lifted his shirt. The pastor squeezed J.K.'s nipple with pliers, causing J.K. to cry out in pain. None of the dozen men intervened on J.K.'s behalf. J.K.'s nipple was sore after the twisting/squeezing, but it did not bleed. J.K. did not tell his Mother about the actions of the men because he presumed she was aware of the events, "since she told the men to handle him, and teach him a lesson."

Approximately two weeks later, a church member went to the Corona Police Department and reported the three incidents described *ante*. The church member explained that the male congregants were punishing J.K. for sexually abusing A.S. The reporting church member was unsure whether Mother knew J.K. was being physically punished by the male congregants. J.K. had been removed from the church's women's

4

home and forced to live in the church's men's home after Mother told the pastor about J.K. abusing A.S.

A social worker from the County of Riverside Department of Public Social Services (the Department) interviewed the children at the Corona police station. A.S. told the social worker J.K. "had 'sex' with her 'a lot.'" J.K. told the social worker "everything was his fault, and he deserves everything that happened to him." J.K. explained that he "needed to be stopped, and the men of the church helped [J.K.] change." J.K. admitted sexually abusing A.S. over a two-year period. J.K. said he began abusing A.S. at daycare by looking at her vagina while she was sleeping, and the abuse progressed to sexual intercourse. J.K. also admitted orally copulating A.S.

J.K. told the social worker about the desert-grave incident, the bathtub-mace incident, and the kitchen-pliers incident. The social worker asked J.K. if he had ever been sexually abused. J.K. recalled, when he was three years old, being forced to orally copulate Father's friend while Father and other people watched. J.K. initially remembered the incident while speaking to the church's pastor "about his behavior and the origins of his perversion." "[A]fter deep contemplation" with the pastor, J.K. recalled the incident when he was three years old.

The Department placed the children in protective custody, in separate foster homes with separate foster agencies. The Department filed a petition alleging (1) Mother failed to protect J.K. because (a) J.K. was subjected to torture while in Mother's custody after Mother asked male congregants to discipline J.K., (b) A.S. was sexually abused by J.K., (c) Mother suffers from untreated mental health issues, such as

5

depression and anxiety, (d) Mother and Father have a history of engaging in domestic violence, (e) J.K. was sexually exploited by Father at the age of three, (f) Father has a criminal history involving two convictions for driving under the influence, (g) Father has a history of being an alcoholic, and (h) Father is not a member of A.S.'s household and does not provide A.S. with adequate food, clothing, shelter, and medical treatment (§ 300, subd. (b)); (2) Mother and Father failed to protect the children from sexual abuse because (a) A.S. was sexually abused by J.K., (b) Mother knew or reasonably should have known J.K. was sexually abusing A.S., and (c) J.K. was sexually exploited by Father at the age of three (§ 300, subd. (d)); and (3) Mother failed to protect J.K. from acts of cruelty because J.K. was tortured by male church congregants after Mother asked male church members to discipline J.K. (§ 300, subd. (e)).

The juvenile court held a detention hearing on April 4, 2012. The children were appointed separate attorneys and separate guardians ad litem. Father was not present at the hearing, but an attorney was appointed for him. Mother denied the allegations set forth in the petition. The juvenile court found J.K. came within section 300, subdivisions (b), (d), and (i), which concern a failure to protect, sexual abuse, and acts of cruelty. The court found A.S. came within section 300, subdivisions (b) and (d), concerning a failure to protect and sexual abuse. The juvenile court found probable cause existed to detain the children and ordered the children continue to be detained.

As to services, the court granted Mother substance abuse treatment and counseling; the court granted Father alcohol and drug testing, parenting classes, and

6

counseling. The court granted Mother supervised visitation with the children twice per week. Father was denied visitation with the children.

C. JURISDICTION/DISPOSITION

On April 11, 2012, a Department social worker spoke to Detective Voorhees of the Corona Police Department. Voorhees requested the Department not contact Father due to the sexual abuse allegations J.K. raised against Father. Voorhees informed the social worker there was no evidence indicating Mother authorized the male congregants to physically abuse J.K. However, statements from members of the church's women's home reflected Mother "reasonably should have known" about the physical abuse J.K. suffered. The evidence also reflected that after Mother learned about the abuse inflicted on J.K. she permitted J.K. to continue residing in the church's men's home.

One week later, the Department social worker spoke to Detective Bryant. Bryant told the social worker that evidence reflected J.K. sexually abused other female children in the church. The other victims had told their parents about the abuse. Bryant believed Mother reasonably should have known about J.K.'s behavior due to the close-knit nature of the church. During an interview conducted by the Riverside Child Assessment Team, A.S. disclosed that there were "several" incidents of sexual abuse with J.K., including oral copulation, vaginal intercourse, and sodomy.

During the time prior to the jurisdiction/disposition hearing, Mother began residing with the church's pastor; the pastor is believed to be the person who twisted J.K.'s nipples with pliers. J.K. and A.S. were doing well in their separate foster placements. Mother visited J.K. three times during April and three times during May;

however, one of the visits only lasted 15 to 20 minutes, due to Mother needing to attend a church function. J.K.'s foster agency found it difficult to schedule visitation appointments with Mother because Mother was "often working or attending church functions," but J.K. spoke to Mother via telephone three times per week.

In contrast, A.S.'s foster agency had little difficulty scheduling visits with Mother two times per week. Telephone contact between Mother and A.S. was also permitted. During one conversation, Mother allegedly told A.S. "not to speak to anybody, especially law enforcement and social workers, about the church or the circumstances regarding her removal, unless a 'magic word' is spoken." The magic word was "footprint."

On May 1, 2012, a social worker interviewed A.S. A.S. told the social worker she saw marks on J.K.'s face during a dinner that took place with Mother within the days after A.S. reported her abuse to Mother and J.K. was forced to live in the church's men's home. A.S. did not ask J.K. about the marks on his face. Mother interacted with J.K. several times that evening, but A.S. was unsure if Mother asked J.K. about the marks on his face. A.S. said Mother and the pastor sometimes slapped J.K.'s face with an open hand in order to discipline him.

A.S. told the social worker she had not seen Father since she was four or five years old. A.S. said she did not like Father "because 'he is mean.'" A.S. said Father hit Mother, which sometimes left marks and bruises on Mother's body. A.S. could not recall specific incidents, and said she only knew of the abuse because Mother described it. A.S. never witnessed Father abuse Mother. After further questioning, A.S. told the

social worker that when she lived with Father "she enjoyed his presence and thought he was nice."

On May 17, 2012, a Department social worker interviewed Father. Father did not know whether Mother was aware J.K. was sexually abusing A.S. He stated J.K. was abused by another male child when J.K. was seven years old. J.K.'s genitals were fondled and he was forced to orally copulate the other child. Father informed the social worker that Mother has a history of mental illness, has attempted suicide three or four times, and abused methamphetamine throughout their marriage. Father denied engaging in domestic violence with Mother. Father explained that he verbally fought with Mother and has a conviction for fighting and using offensive words.

Father "adamantly denied" sexually exploiting J.K. by forcing the child to orally copulate Father's friend. Father could not explain why J.K. would level such an allegation. Father admitted suffering drunk driving convictions. Father stated he was currently on informal probation due to a 2009 conviction for driving under the influence. Father said his alcohol consumption increased after Mother left him and took the children. However, Father denied being an alcoholic. Father explained that he only drinks on weekends and at social gatherings. Father believed his drunk driving convictions "were a result of poor judgment rather than an indication of alcohol abuse." Father admitted consuming five beers prior to the social worker's unannounced visit on a Thursday at 11:30 a.m.

Father told the social worker he had not seen the children for approximately three years; however, he claimed that he had been sending child support "on a consistent basis" since he and Mother separated. Father requested the children be placed in his custody. Father told the social worker he planned to complete reunification services, in order to reunify with the children.

Voorhees told the social worker it was questionable whether Father sexually exploited J.K., because J.K. was three years old when the abuse allegedly occurred, but J.K. was able to provide precise details regarding the abuse and the people present at the time. Voorhees noted that the church is comprised of several people who are sexual abuse victims, and therefore it is possible J.K. fabricated the abuse allegations involving Father.

The Department social worker also spoke to P.C., the children's maternal aunt. P.C. said Mother began "cutting ties with her family" when she joined the church in 2007. P.C. was persistent in maintaining contact with Mother and the children, so she attended several church functions. P.C. felt "very uncomfortable" at the church. The pastor encouraged congregants to "cut off all contact with non-church members, especially family." P.C. believed the children were not safe with Mother as long as Mother was a member of the church. Several aunts and uncles were willing to take custody of the children. The Department recommended the children continue to remain outside of Mother's and Father's custody, but that Mother and Father receive reunification services.

On May 29, 2012, the juvenile court found Father to be the children's presumed father. On June 13, 2012, the juvenile court held a jurisdiction and disposition hearing. Judge Tempore James Wiley presided over the hearing. Father was present at the hearing. Father's attorney informed the court that Father was "in agreement with services" but "would like to be heard . . . with regard to any requests by mother for placement." The juvenile court announced that it "would grant an order returning the children—both children, especially the son, to the mother upon [a] suitable home evaluation." Father's attorney (Shipley) informed the court that the commissioner who previously worked on this case, Commissioner Perantoni, said "if he could have found a way to deny [Mother] services he would have." Shipley requested the juvenile court continue the disposition portion of the hearing. Shipley further requested that Commissioner Perantoni preside over the disposition hearing.

Shipley directed the court's attention to the "magic word" discussion Mother had with A.S. The juvenile court responded that it did not intend to place the children in a church residence. Shipley asked for a psychological evaluation of Mother. A "court officer" explained that Mother had already participated in a mental health evaluation, which is different than a psychological evaluation. The juvenile court said, "We're going to leave it at that."

The juvenile court found jurisdiction was established pursuant to section 300, subdivisions (b), (d), and (i), which concern a failure to protect, sexual abuse, and acts

11

of cruelty. The juvenile court found all the allegations in the original petition to be true.[3]

A contested disposition hearing was held on June 28, 2012. Commissioner Matthew C. Perantoni presided over the hearing. Mother's attorney stated a chambers conference took place concerning the disposition. Mother's attorney said, "I'm submitting on the Department's recommendation and our in-chambers conference in regards to services to mother." The Department recommended the children continue to be placed outside of Mother's and Father's custody, but that Mother and Father receive reunification services and Mother be given visitation.

Shipley argued it was not appropriate for Mother to be granted reunification services because services should be denied due to the finding that J.K. suffered severe physical harm. (§ 361.5, subd. (b)(6).) Shipley argued Mother knew about the torture J.K. suffered because J.K. had puffy eyes from the mace and marks on his back. Shipley asserted Mother was so entrenched in the church doctrine and "brainwashed" that she could not benefit from services. Shipley asked that if the court ordered reunification services for Mother that it also order a psychological evaluation of Mother.

_____

[3] Prior to making the jurisdictional findings, the juvenile court ordered the Department's first amended petition to be filed and commented that the amended petition "super[s]edes the original"; however, it appears the juvenile court's findings concern the original petition. We draw this inference because (1) the minute order explicitly reflects the court's findings relate to the original petition, and (2) the court merely adopted the Department's recommendations as its findings, and the recommendations were made prior to the amended petition being filed.

J.K.'s attorney argued that J.K. wanted Mother to be granted reunification services, because J.K. hoped to be reunited with Mother. J.K. did not want to visit with Father, but submitted on the issue of Father's reunification services. J.K.'s attorney also asked for a cellular telephone for J.K., so that J.K. could have unsupervised telephone contact with Mother.

Mother's attorney asked the court to order a psychological evaluation of Father. Mother's attorney noted that an allegation of sexual exploitation concerning Father and J.K. was found true. Shipley asserted that allegation was stricken and the juvenile court agreed the allegation was stricken.

The first amended petition has a variety of handwriting on it. The initials "CM" appear next to various strikes and modifications; County Counsel's name is Cynthia Morton, thus, we infer County Counsel made the modifications. The amended allegations are as follows: (1) While in Mother's custody, J.K. was subjected to acts of torture by church members; (2) Mother knew or reasonably should have known J.K. was sexually abusing A.S. and failed to seek appropriate treatment for either child; (3) Mother suffered from mental health issues, including depression and anxiety; (4) Mother and Father have a history of domestic violence and there is an active restraining order in place, (5) Father has a history of driving under the influence, (6) Father has a history of abusing alcohol, (7) Father is not a member of A.S.'s household and "fails to make himself available to provide the child with adequate food, clothing, shelter, and medical treatment," (§ 300, subd. (b) [allegations one through seven]) (8) Mother knew or reasonably should have known J.K. was sexually abusing A.S. and failed to seek

13

appropriate treatment for either child (§ 300, subd. (d)), and (9) while in Mother's custody, J.K. was subjected to acts of torture by members of Mother's church.

Mother's attorney argued the petition was modified to reflect Mother was not aware of the torture J.K. suffered, and therefore services should be granted. Additionally, Mother's attorney stated there were no marks on J.K., which was a topic the parties spoke "very much [about] in chambers," and therefore Mother was "submitting on services" and asking for liberalized visitation.

The Department argued it would be detrimental to the children for Mother not to receive services. The Department asserted there was no evidence Mother knew J.K. would be tortured before it happened, but that she probably was aware of it after it occurred. The Department supported the request for a psychological evaluation of Mother, due to her history of mental illness.

J.K.'s attorney (Williams) stated that, in chambers, the parties discussed a court "authorization for placement or . . . overnight visits with mother." Williams explained that J.K. wanted to live with Mother immediately. Williams, in his capacity as J.K.'s guardian, objected to J.K. returning to Mother's care while Mother was "residing anywhere near the church property or by church members." Mother's attorney objected to Mother participating in a psychological evaluation, arguing that the already completed mental health evaluation was sufficient.

The juvenile court addressed Shipley's argument concerning services for Mother. The court said, "The Court did give some consideration to [section] 361.5(b)(6) in its review of all of the reports, and hearing argument from counsel—though the Court has a

14

suspicion, it may be even a strong suspicion that (b)(6) applies—the evidence before the court is not clear and convincing to indicate (b)(6) applies. So at this time the Court will order that [the Department] provide reunification services to both mother and father." The court ordered the children not have any contact with current or former members of the church. The court ordered the Department to liberalize Mother's visitation with the children "to include unsupervised, overnight and weekend visitation." The court advised Mother that she may need to move residences in order to comply with the court's orders. The court granted Father visitation with the children in a therapeutic setting.

## DISCUSSION

### A.    STANDING

Father's appeal concerns the court's order granting Mother's reunification services. Father asserts he has standing to bring this appeal because his interest in his children was affected by the juvenile court's decision; Father specifically cites his interests in (1) regaining custody of the children, and (2) the children's safety and protection. We conclude Father does not have standing to raise this issue on appeal.

"Not every party has standing to appeal every appealable order. Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal. [Citations.] An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the

15

decision.  [Citations.]  These rules apply with full force to appeals from dependency proceedings.  [Citation.]"  (*In re K.C.* (2011) 52 Cal.4th 231, 236.)

To determine whether a father is aggrieved by a juvenile court's order, the court must identify the father's interest in the matter.  (*In re K.C.*, *supra*, 52 Cal.4th at p. 236.)  "All parents, unless and until their parental rights are terminated, have an interest in their children's 'companionship, care, custody and management . . . .'  [Citation.]"  (*Ibid.*)  However, "the mere fact a parent takes a position on a matter at issue in a juvenile dependency case that affects his or her child does not alone constitute a sufficient reason to establish standing to challenge an adverse ruling on it."  (*In re Carissa G.* (1999) 76 Cal.App.4th 731, 736.)

Father's interest in the dependency proceeding is to reunify with his children.  The court orders about mother's case plan for reunification with the children do not adversely affect that interest.  Father's appeal is raising interests that belong to people other than Father.  Father is asserting the children's interest in reuniting with a mother that is capable of caring for them in an healthy manner.  It is not enough for Father to simply assert the children's interest as a basis for his standing.  (*In re Nachelle S.* (1996) 41 Cal.App.4th 1557, 1562.)  Father's own interest in reunifying with his children is not so intertwined with the children's best interests as to give him standing.  (See § 317, subd. (c) [appointment of independent counsel for minors in order to avoid conflicts of interest].)

Because Father is not personally aggrieved by the order he challenges, this court is without jurisdiction to consider his claim.  (See *In re D.S.* (2007) 156 Cal.App.4th

16

671, 674 ["Without a showing that a parent's personal rights are affected by a ruling, the parent does not establish standing."].)  Thus, the appeal must be dismissed.

## DISPOSITION

The appeal is dismissed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
                                                                              J.

We concur:

RICHLI
          Acting P. J.

KING
          J.

17